JAMES ANDREW HINDS, JR. (SBN 71222)
jhinds@jhindslaw.com
PAUL R. SHANKMAN (113608)
pshankman@jhindslaw.com
RACHEL M. SPOSATO (SBN 306045)
rsposato@jhindslaw.com
HINDS & SHANKMAN, LLP
21257 Hawthorne Blvd., 2nd Floor
Torrance, CA 90503
Telephone: (310) 316-0500
Facsimile:  (310) 792-5977

Attorneys for Baylor Holding, LLC,
Equity Creditor and Managing Member of Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>779 STRADELLA, a Delaware limited liability company,<br><br>    Debtor and Debtor in Possession. | Case No. 8:16-bk-15156-CB<br><br>Chapter 11<br><br>**NOTICE OF OBJECTION AND OBJECTION OF BAYLOR HOLDING, LLC TO CLAIM NO. 7-1 FILED BY DCM P-8, LLC; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JEFFREY C. YOHAI IN SUPPORT THEREOF**<br><br>Hearing:<br><br>Date:  December 13, 2017<br>Time:  10:00 a.m.<br>Place: Courtroom 5D |

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCYJUDGE, THE UNITED STATES TRUSTEE, DISPUTED CREDITOR, DCM P-8, LLC, ALL PARTIES-IN-INTEREST, AND THEIR RESPECTIVE COUNSEL:**

**1**

**PLEASE TAKE NOTICE** that Baylor Holding, LLC, Equity Creditor and Managing Member ("Baylor") of the Debtor and Debtor-in-Possession (the "Debtor") in the above-captioned chapter 11 case hereby submits its objection (the "Objection") to Claim No. 7-1 filed by DCM P-8, LLC ("DCM") in the amount of $207,065.80 (the "DCM Claim").

Baylor objects to the DCM Claim because:

1. DCM's filed Claim is completely unsupported by any documentation, fact, or law;

2. DCM's claim relates to a Purchase and Sale Agreement (the "Purchase Agreement") of the Debtor's real property which DCM breached by failing to close a purchase of the Debtor's real property on or before the last extended deadline Ordered by the Court of October 20, 2017 in consideration for DCM's payment of Adequate Protection Payments to Genesis, the First Position Deed of Trust holder on the real property of the Estate;

3. DCM now owes the Debtor's Estate Liquidated Damages of $10,000.00 in cash and has waived all claims against the Debtor's Estate pursuant to the Liquidated Damages Provision of the Purchase Agreement approved by the Court as part of the Debtor's Motion to Sell the Debtor's real property to DCM that has now been breached by DCM; and

4. There is no Court Order abrogating the Liquidated Damages Clause of the Purchase Agreement which allows any claim to DCM against the Debtor, Administrative, or otherwise.

Baylor therefore requests that Court disallow and expunge the DCM Claim. Baylor makes this Objection pursuant to section 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 3007-1. The Objection is based on this Notice, the attached Memorandum of Points and Authorities, the accompanying Declaration of Jeffrey C. Yohai (the "Yohai Declaration"), and the exhibits thereto, the record and pleadings in this case, and any oral or documentary evidence presented at or prior to the time of the hearing on this Objection.

**2**

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will be held on December 13, 2017 at 10:00 a.m., or as soon thereafter as can be heard, before the Honorable Catherine E. Bauer, United States Bankruptcy Judge, in Courtroom 5D of the United States Bankruptcy Court located at 411 West Fourth Street, Fifth Floor, Santa Ana, CA  92701.

**PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rule 3007-1(b)(3)(A) requires that any response to this Objection be filed with the Court and served upon counsel for Baylor at the address set forth in the upper left-hand corner of the first page of this Notice at least 14 days prior to the hearing date.  Pursuant to Local Bankruptcy Rule 3007-1(b) (3) (B), the failure to timely file and serve written opposition may be deemed by the Court to be consent to the granting of the relief requested in the Objection.

**WHEREFORE,** Baylor respectfully requests that the Court (1) grant this Objection, (2) enter an order disallowing the Claim as requested herein, and (3) award such other and further relief as the Court deems just and proper.

DATED:  November 10, 2017                          Respectfully submitted,

                                                  HINDS & SHANKMAN, LLP

                                                  By: _/s/Paul R. Shankman____
                                                  JAMES ANDREW HINDS, JR.
                                                  PAUL R. SHANKMAN
                                                  Attorneys for Baylor Holding, LLC,
                                                  Equity Creditor and Managing Member
                                                  of the Debtor

NOTICE OF OBJECTION AND OBJECTION OF BAYLOR HOLDING, LLC TO CLAIM NO. 7-1 FILED BY DCM P-8, LLC; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JEFFREY C. YOHAI IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.        STATUS OF THE CASE AND JURISDICTION

The Debtor commenced this case by filing a voluntary Petition for relief under chapter 11 of the Bankruptcy Code on December 21, 2016 (the "Petition Date").  The Debtor is in possession of its property and is managing its affairs pursuant to Bankruptcy Code sections 1107 and 1108.  No request for a trustee or examiner has been made.  This Court has jurisdiction over the Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtor's chapter 11 case and the Objection is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are Bankruptcy Code section 502(b) (9) and Bankruptcy Rule 3007.

### II.       STATEMENT OF FACTS

#### A.       General Background

Detailed factual background regarding the Debtor and the commencement of the case is set forth in prior pleadings and papers on file with this Court and will not be repeated herein.

The Debtor is managed by its Managing Member, Baylor Holding, LLC pursuant to Schedule III of the attached fully executed copy of the Baylor Holding, LLC Operating Agreement, a true and correct copy of which is attached hereto as Exhibit "1" and is incorporated herein by this reference as if set forth in full.  (See the attached Declaration of Jeffrey A. Yohai, Managing Member of Baylor (the "Yohai Dec.") at ¶ 2.)  Mr. Yohai, in turn, is the Managing Member of Baylor and President and Chief Executive Officer of Baylor. (See Exhibit "1" at pages 18-19 and the Yohai Dec. at ¶ 2.)   Mr. Yohai by and through Baylor is the Managing Member of Baylor as the Managing Member of the Debtor and Baylor is the 100% owner of the Debtor.  Please see page 13 of the fully executed copy of the 779 Stradella, LLC Operating Agreement, a true and correct copy of which is attached hereto as Exhibit "2" and is incorporated herein by this reference as if set forth in full.  (Yohai Dec. at ¶ 2.)

**4**

The Debtor filed, served, and Noticed its Motion to Sell the 779 Stradella, LLC real property on June 7, 2017 as Court Docket No. 76, a true and correct copy of which is attached hereto as Exhibit "3" and is incorporated herein by this reference as if set forth in full ("Sale Motion").  (Yohai Dec. at ¶ 3.)

Attached to Exhibit "3" as Exhibit "1" to same is a true and correct copy of the Purchase and Sale Agreement and Joint Escrow Instructions ("Purchase Agreement") containing the Terms and Conditions approved by the Court for the sale of the Estate's real property to DCM.  Pursuant to page 27 of Exhibit "3", paragraph 13.2 is an agreed upon Court Approved Liquidated Damages Clause which provides that if the Buyer, DCM, breaches the Purchase Agreement, it must pay the Debtor's Estate $10,000.00 and no further claims may be allowed by DCM against the Estate:

13.2      " DEFAULT BY BUYER

IF THE CLOSING DOES NOT OCCUR BY REASON OF ANY DEFAULT BY BUYER, BUYER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE TI-IE DAMAGES SUFFERED BY SELLER AS A RESULT OF BUYER'S FAILURE TO COMPLETE THE PURCHASE OF THE PROPERTY PURSUANT TO THIS AGREEMENT, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SUBSECTION REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER WILL INCUR AS A RESULT OF SUCH FAILURE; PROVIDED HOWEVER, THAT THIS PROVISION WILL WAIVE OR AFFECT BUYER'S INDEMNITY OBLIGATIONS AND SELLER'S RIGHTS TO THOSE INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, BUYER AND SELLER DO HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE

**5**

TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER 1N THE EVENT TIIAT BUYER DEFAULTS OR FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY IS AN AMOUNT EQUAL TO TEN THOUSAND DOLLARS ($10,000 .00). THIS AMOUNT WILL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY BUYER.   THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR A PENALTY AGAINST BREACH, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER UPON DEFAULT BY BUYER, THIS AGREEMENT WILL BE TERMINATED AND, EXCEPT FOR BUYER'S INDEMNITY OBLIGATIONS WHICH MAY BE ENFORCED BY SELLER, **NEITHER PARTY SHALL HAVE ANY FURTHER RIGHTS OR OBLIGATIONS HEREUNDER**, (Emphasis added.)  (Yohai Dec. at ¶  4.)

Pursuant to the Purchase Agreement and Exhibit "3" at pages four and five of the Sale Motion, DCM agreed to make Adequate Protection Payments to Genesis, the First Priority Secured Creditor, in consideration for additional time to complete its Due Diligence and to procure the funds to close the sale. (Yohai Dec. at ¶ 4.)

Attached hereto as Exhibit "4" is a true and correct copy of the Court's final Order approving the Purchase Agreement and the final extension of time for DCM to close the sale set as October 20, 2017 as Court Docket No. 115.  DCM breached and failed to close the sale on or before said date which has not been extended, thereby triggering the Liquidated Damages Clause and waiving all Claims against the Debtor's Estate.  There is no Court Order abrogating the Liquidated Damages Clause of the Purchase Agreement which allows any claim to DCM against the Debtor, Administrative, or otherwise.  (Yohai Dec. at ¶ 5.)

**6**

Attached hereto as Exhibit "5" is a true and correct copy of DCM's Proof of Claim filed against the Debtor's Estate on October 20, 2017 as Claim No. 7-1, hereby requested to be disallowed in its entirety.  (Yohai Dec. at ¶ 5.)

In light of the foregoing, DCM has waived any claims against the Debtor's Estate and its Proof of Claim should therefore be disallowed in its entirety.  (Yohai Dec. at ¶7.)

## III.    OBJECTION

Bankruptcy Code section 502(b) requires, in relevant part, that if a party in interest objects to a claim:

(b) …the court, after notice and a hearing, shall determine the amount of such claim…as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. 11 U.S.C. § 502(b).

All allegations set forth in a properly filed proof of claim are taken as true and, if the allegations set forth all facts necessary to establish a claim and are not self-contradictory, the proof constitutes prima facie evidence of the validity and amount of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).  Once the objector raises "facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves," Wright v. Holm (In re Holm), 931 F.2d 620, 623 (9th Cir. 1991), then "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence."  Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage), 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995), aff'd, 91 F.3d 151 (9th Cir. 1996).  "[T]he ultimate burden of persuasion is always on the claimant."  Holm, 931 F.2d at 623.

Pursuant to this Objection, Baylor seeks to disallow the DCM Claim because it has been waived as a result of DCM's breach of the Purchase Agreement and terms of the

7

1    Liquidated Damages Clause of same.  In addition, the DCM Claim as file3d is supported by

2    any facts by which this Court can conclude that the Claim is valid.  As such, it is reasonable

3    and appropriate to disallow and expunge the DCM Claim.

4

5        **IV.    CONCLUSION**

6        Baylor respectfully requests that this Court: **(1)** grant this Objection; **(2)** enter an

7    Order disallowing the DCM Claim as requested herein; and **(3)** award such other and further

8    relief as the court deems just and proper.

9

10   DATED:  November 10, 2017                    Respectfully submitted,

11                                               HINDS & SHANKMAN, LLP

12
                                                 By:_ /s/Paul R. Shankman____
13                                               JAMES ANDREW HINDS, JR.
                                                 PAUL R. SHANKMAN
14                                               Attorneys for Baylor Holding, LLC, Equity
                                                 Creditor and Managing Member of the
15                                               Debtor

16

17

18

19

20

21

22

23

24

25

26

27

28

**8**

# DECLARATION OF JEFFREY C. YOHAI

I, Jeffrey C. Yohai declare and state as follows:

1.    I am an individual residing in the City of Los Angeles, California, and over the age of 18.  I make this Declaration based upon my own personal knowledge.  If called upon to testify to the statements made herein, I would do so truthfully under the penalty of perjury.

2.  The Debtor, 779 Stradella, LLC,  is managed by its Managing Member, Baylor Holding, LLC pursuant to Schedule III of the attached fully executed copy of the Baylor Holding, LLC Operating Agreement, a true and correct copy of which is attached hereto as Exhibit "1" and is incorporated herein by this reference as if set forth in full.  I, in turn, am the Managing Member of Baylor and President and Chief Executive Officer of Baylor.  (See Exhibit "1" attached hereto at pages 18-19.)  I am by and through Baylor the Managing Member of the Managing Member, Baylor, of the Debtor and Baylor owns 100% of the Debtor.  Please see page 13 of the fully executed copy of the 779 Stradella, LLC Operating Agreement, a true and correct copy of which is attached hereto as Exhibit "2" and is incorporated herein by this reference as if set forth in full.

3.  The Debtor filed, served, and Noticed its Motion to Sell the Mt. Yohai Real Property on June 7, 2017 as Court Docket No. 76, a true and correct copy of which is attached hereto as Exhibit "3" and is incorporated herein by this reference as if set forth in full ("Sale Motion").

4.  Attached to Exhibit "3" as Exhibit "1" to same is a true and correct copy of the Purchase and Sale Agreement and Joint Escrow Instructions ("Purchase Agreement") containing the Terms and Conditions approved by the Court for the sale of the Estate's real property to DCM.  Pursuant to page 27 of Exhibit "3", paragraph 13.2 is an agreed upon Court Approved Liquidated Damages Clause which provides that if the Buyer, DCM, breaches the Purchase Agreement, it must pay the Debtor's Estate $10,000.00 and no further claims may be allowed by DCM against the Estate:

/ / /

/ / /

**9**

13.3    " DEFAULT BY BUYER

IF THE CLOSING DOES NOT OCCUR BY REASON OF ANY DEFAULT BY BUYER, BUYER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE TI-IE DAMAGES SUFFERED BY SELLER AS A RESULT OF BUYER'S FAILURE TO COMPLETE THE PURCHASE OF THE PROPERTY PURSUANT TO THIS AGREEMENT, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SUBSECTION REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER WILL INCUR AS A RESULT OF SUCH FAILURE; PROVIDED HOWEVER, THAT THIS PROVISION WILL WAIVE OR AFFECT BUYER'S INDEMNITY OBLIGATIONS AND SELLER'S RIGHTS TO TIIOSE INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, BUYER AND SELLER DO HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER 1N THE EVENT TIIAT BUYER DEFAULTS OR FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY IS AN AMOUNT EQUAL TO TEN THOUSAND DOLLARS ($10,000.00). THIS AMOUNT WILL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY BUYER.  THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR A PENALTY AGAINST BREACH, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER UPON DEFAULT BY BUYER, THIS AGREEMENT WILL BE TERMINATED AND, EXCEPT FOR BUYER'S INDEMNITY OBLIGATIONS WHICH MAY BE ENFORCED BY SELLER, **NEITHER PARTY SHALL HAVE ANY FURTHER RIGHTS OR OBLIGATIONS HEREUNDER**, (Emphasis added.)

5.    Pursuant to the Purchase Agreement and Exhibit "3" at pages four and five of the Sale Motion, DCM agreed to make Adequate Protection Payments to Genesis, the First

**10**

1  Priority Secured Creditor, in consideration for additional time to complete its Due Diligence

2  and to procure the funds to close the sale.  I am informed and believe, and upon said

3  information and belief assert that DCM in fact made Adequate Protection Payments to

4  Genesis in order to keep it option to purchase alive.  However, DCM breached the Purchase

5  Agreement by failing to close the purchase.

6  6.    Attached hereto as Exhibit "4" is a true and correct copy of the Court's final

7  Order Approving the Purchase Agreement and the final extension of time for DCM to close

8  the sale set as October 20, 2017 as Court Docket No. 115.  DCM breached and failed to

9  close the sale on or before said date which has not been extended, thereby triggering the

10  Liquidated Damages Clause and waiving all Claims against the Debtor's Estate.  There is

11  no Court Order abrogating the Liquidated Damages Clause of the Purchase Agreement

12  which allows any claim to DCM against the Debtor, Administrative, or otherwise.

13  7.    Attached hereto as Exhibit "5" is a true and correct copy of DCM's Proof of

14  Claim filed against the Debtor's Estate on October 20, 2017 as Claim No. 7-1, hereby

15  requested to be disallowed in its entirety.

16  8.    In light of the foregoing, DCM has waived any claims against the Debtor's

17  Estate and its Proof of Claim should therefore be disallowed in its entirety.

18

19  I declare under the penalty of perjury and under the laws of the United States of

20  America and the State of California that the foregoing is true and correct and that this

21  Declaration was executed on this 13th Day of November, 2017 at Los Angeles, California.

22

23  _____
   Jeffrey C. Yohai

**11**

# EXHIBIT "1"

# EXHIBIT "1"

OPERATING AGREEMENT
of
BAYLOR HOLDING, LLC

This Operating Agreement ("Operating Agreement") of BAYLOR HOLDING, LLC, ("Company"), having an address of 10 St. James Drive, Palm Beach Gardens, Florida 33418, is entered into as of February 11, 2016 by and among the Company, Jeffrey Yohai ("JY") and Paul J. Manafort ("PJM").

## RECITALS

The Members have caused to be formed, and now desire to organize a limited liability company pursuant to the Delaware Revised Uniform Limited Liability Company Act, as amended, or any successor statute (the "Act");

The Company and the Members executing this Agreement desire to establish their respective rights and obligations in connection with forming and operating the Company;

In consideration of the mutual covenants and provisions contained in this Operating Agreement, the parties hereto agree as follows:

1. Definitions

For purposes of this Operating Agreement, the following terms have the following meanings:

"Affiliate" of a subject Person means a Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the subject Person.

"Agreement" means this Operating Agreement, as amended, restated or supplemented.

"Bankruptcy" of a Member means (a) the Member's filing a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code (or corresponding provisions of future laws) or any other federal, state or foreign insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition, (b) the Member's making any assignment for the benefit of its creditors or the Member's admission in writing of its inability to pay its debts as they mature, or (c) the expiration of 60 days after the filing of an involuntary petition under Title 11 of the United States Code (or corresponding provisions of future laws), seeking an application for the appointment of a receiver for the Member's assets, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal, state or foreign insolvency law, provided that the petition has not been vacated, set aside or stayed within the 60 day period.

1

"Business Day" means any day except Saturday, Sunday or a day that banking institutions in Delaware are obligated by law, regulation or governmental order to close.

"Capital Account" means each capital account maintained for a Member pursuant to Section 4.03 or otherwise of this Agreement.

"Capital Transaction" shall mean the sale or other disposition of assets of the Company outside the normal course of business, including but not limited to a sale of all or substantially all of the Company assets.

"Certificate of Formation" means the Company's Certificate of Formation as file with the Delaware Secretary of State of other offices as the same may be designated, pursuant to the Act, or otherwise, as amended or restated.

"Certified Public Accountant" means the independent certified public accountant or firm of certified public accountants licensed in the state of Delaware, Florida or California and engaged by the Company from time to time.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute.

"Company Year" means the taxable year of the Company as determined pursuant to Section 8.01 of this Agreement.

"Control," "Controls" or "Controlled" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, through contract, or otherwise.

"Indemnitee" has the meaning specified in Section 6.03(a) of this Agreement.

"Initial Capital" means, for any Member, the capital contributed by such Member as of the date of this Agreement.

"Involuntary Transfer" means that (a) a Member's Membership Interest Units are involuntarily sold, transferred or otherwise disposed, or encumbered, or an involuntary sale, transfer, disposal or encumbrance is threatened by any third party, whether by sale upon execution or in foreclosure of any pledge, hypothecation, lien, judgment or charge, or any other means; (b) a Member files a voluntary petition under any federal or state bankruptcy, insolvency or related law or a petition for the appointment of a receiver, or makes an assignment for the benefit of creditors, or is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his or her Membership Interest Units in the Company and such involuntary petition, assignment, or attachment is not discharged within 30 days after its effective date; (c) in connection with the dissolution of marriage of any married Member, such Member enters into a property settlement agreement or any court issues an

2

interlocutory decree or other order, the terms of which transfer or award any Membership Interest Units or interest in the Membership Interest Units to the Member's spouse, whether as a confirmation or disposition of the spouse's rights under applicable community property, equitable distribution or similar state law; (d) conviction of a felony; (e) conviction of a crime against the Company; (f) Member's (i) willful dishonesty towards, fraud upon, or deliberate injury or attempted injury to, the Company, (ii) Member's gross negligence or intentional misconduct with respect to the performance of Member's duties or obligations to the Company, provided, however, that no such Involuntary Transfer shall be deemed to have taken place under this Subsection (f) (ii) unless the Company has provided Member with written notice of what it reasonably believes are the grounds for such Involuntary Transfer and Member fails to take appropriate remedial actions during the thirty day period following receipt of such written notice.

"Majority Interest" means a Membership Interest of greater than 50%.

"Member" means each of the Persons listed from time to time on Schedule I of this Agreement, and any transferee of a Member who is admitted to the Company as a Member in accordance with Article 10 or 11 of this Agreement; and "Members" means two or more such Persons.

"Membership Interest" means a Member's aggregate rights in the Company, share of the Company's profits and losses, the right to receive distributions from the Company and the right to vote and participate in the management of the Company, as set forth on Schedule I of this Agreement.

"Net Losses" shall mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company for federal income tax purposes and as reported on the tax return of the Company for federal income tax purposes.

"Net Profits" shall mean the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company for federal income tax purposes and as reported on the tax return of the Company for federal income tax purposes.

"Permanent Disability" means a Member's incapacity due to physical or mental disability or illness which shall have satisfied all of the conditions for the receipt of permanent disability benefits under the terms of any disability buy out policy maintained for such Member's benefit. If there is no disability buyout insurance policy in force, a Member shall be deemed to be permanently disabled upon the first to occur of (i) being adjudicated totally disabled by the Worker's Compensation Statute in the State where such Member resides; (ii) being adjudicated totally disabled pursuant to the Federal Social Security Disability Insurance Program (SSDI) or (iii) if the Member is unable to perform his or her duties and obligations on behalf of the Company for a period of 90 consecutive days.

3

"Person" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization, or other entity or organization, including any government or political subdivision or any agency or instrumentality of any entity.

"Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during that period to funds that must be maintained in an amount deemed sufficient by the Class A Members in their sole discretion for working capital and for taxes, Mandatory Tax Distributions insurance, debt service, capital improvements and replacements and other costs or expenses incident to the ownership or operation of the Company's business.

"Surplus Cash" means the Company's cash on hand less any Reserves.

"Transfer" means any sale, assignment, exchange, gift, or other disposition of any kind, voluntary or involuntary, including the creation or existence of any charging order, lien or encumbrance, whether direct or indirect, voluntary or involuntary.

## 2.    Organizational and Other Matters

### 2.01    Formation; Admission

The Members have caused the Company to be formed under the provisions of the Act by filing the Certificate of Formation. Each of the Members listed on Schedule I of this Agreement has been admitted to the Company as a Member. The rights and liabilities of the Members are as provided in the Act, except as otherwise expressly provided in this Agreement.

### 2.02    Name

The name of the Company is, and the Company's business will be conducted under the name of Baylor Holding, LLC. On the Members prior written consent, (a) the Company's business may be conducted under any other name or names, and (b) the Company's name may be changed at any time.

### 2.03    Principal Office

The Company's principal office will be at the address set forth for the Company above, or such other place as the Members may determine. The Company may maintain offices at other places as the Members deems advisable.

### 2.04    Term

The Company commences on the date of filing of the Certificate of Formation, and the Company's term is perpetual, or until the earlier dissolution of the Company in accordance with the provisions of Article 13 of this Agreement or as otherwise provided by law.

4

3.   Purpose and Powers

3.01   Company Purpose
The Company's purpose and business is to act as a holding entity of multiple and various real estate and construction ventures, projects and companies, and to engage in all transactions reasonably necessary or incidental to the foregoing.

3.02   Company Powers
The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes and business described above and for the Company's protection and benefit.

3.03   Projects
Although it is intended that the Company will continue to add additional projects through the acquisition of other companies or otherwise, the Company acknowledges its acquisition of the projects set forth on Schedule III hereto.

4.   Capital Contributions
4.01   Current Capital Contributions
The Members have contributed in cash and other assets to the Company the amount of Initial Capital Contribution set forth in Schedule II of this Agreement. It is specifically acknowledged that PJM has contributed in capital contributions and loans the sum of $2,250,000.00 in exchange for his Membership Interest in the Company and it is further acknowledged that JY has contributed $2,100,000.00 in exchange for his Membership Interest in the Company..

4.02   Additional Capital Contributions and Cash Advances
No Member is required to make any additional Capital Contribution to the Company, unless the Members unanimously agree to require such additional Capital Contributions, which shall be required of all Members in proportion to each Member's Membership Interest.

4.03   Capital Accounts
The Company must maintain a separate Capital Account for each Member. The term "Capital Account" means as to any Member the Member's amount of the Initial Capital in the Company, that is (i) increased by any additional capital contributions made by the Member, and income and gain allocated to the Member pursuant to Section 5.01(a) or (c) of this Agreement and (ii) decreased by distributions to the Member pursuant to Sections 5.01(b) and 12.02 and losses and deductions allocated to such Member pursuant to Section 5.01(a) or (c). The fair market value of any property contributed to the Company by a Member or distributed to a Member by the Company will be credited or debited to the Member's Capital Account.

4.04   No Interest
Except as otherwise expressly provided in this Agreement, no interest will be paid by the Company on capital contributions, balances in Member's Capital Accounts or any other funds

5

contributed to the Company or distributed or distributable by the Company under this
Agreement.

4.05  No Withdrawal or Restoration
Except as provided in Article 10 of this Agreement, no Member has the right to withdraw any
portion of the Member's Capital Account without the consent of all the other Members. In
accordance with the Act, a Member may, under certain circumstances, be required to return to
the Company, for the benefit of the Company or the Company's creditors, amounts previously
wrongfully distributed to the Member. At no time during the term of the Company or upon the
dissolution and liquidation of the Company shall a Member with a negative balance in his
Capital Account have any obligation to the Company or to any other Member to restore such
negative balance, except in respect of any negative balance resulting from a distribution in
contravention of this Agreement or the Act.

5.  Allocations and Distributions

5.01  Allocations of Net Profits and Net Losses

(a)    Net Profits recognized by the Company in connection with a Capital Transaction, or upon
the dissolution and winding up of the Company, after giving effect to all events occurring prior
to such sale or other disposition, or dissolution and winding up, shall be first allocated to
eliminate any deficit in the Members' Capital Accounts in proportion to such Member's deficit
Capital Accounts and then the balance shall be allocated to the interest units in accordance with
the distribution of profits and losses in accordance with their Membership Interests.

(b)    Net Losses recognized by the Company in connection with a Capital Transaction, or upon
the liquidation and termination of the Company, after giving effect to all events occurring prior
to such sale or other disposition, or liquidation and termination, shall be allocated to the
Membership Interest Units in proportion profits pursuant to Section 5.01(a) hereof.

(c)    Intentionally Omitted.

(d)    Intentionally Omitted.

(e)    Each decision as to the timing, form and amount of distributions must be made by the
majority of the Members; provided, however, that (i) in the event the Company allocates taxable
income to the Members in any Company Year, the Company must distribute to each Member in
respect of such Company Year a minimum cash distribution calculated by multiplying the
taxable income allocated to such Member by the highest effective tax rate for individuals
(collectively, "Mandatory Tax Distributions") and (ii) after accounting for Mandatory Tax
Distributions, then the Company's Surplus Cash as of December 31 in each year may be
distributed to the Members as of the date of the determination. Payments must be made no later
than April 1ST of the subsequent year.

6

(f)    Except as required by Code Sections 704(b) and 704(c), the allocation among the Members of items of Company's income, deduction, gain, loss and credits for income tax purposes will be determined in accordance with the allocations provided in Section 5.01(a) and (b) of this Agreement.

5.02   Return of Contribution

Except as required by the Act, no Member is personally liable for the return of its capital contributions, or any portion of them, or the return of any additions to the Capital Accounts of the other Members, or any portion of them.   Any return of capital as may be made at any time, or from time to time, will be made solely from the assets of the Company, and only in accordance with the terms of this Agreement.

6.   Management and Operation of Business

6.01   Management

(a)    The Company's business and affairs will be managed by its Managers as they may be elected and appointed from time to time. The Managers will direct, manage and control the Company's business to the best of their ability. The Managers have full authority and discretion to manage and control the Company's business, affairs and properties, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business. All management decisions regarding construction, financial matters and additional acquisitions shall be made jointly, and only with the written approval of PJM. Voting on any matters requiring Membership participation will be based upon their respective Membership Interest with each Member having one vote. The participation of all of Members in person or by proxy pursuant to the Act, shall constitute a quorum for the transaction of business. Any act approved by a majority of the quorum shall be the act of the Company. If there is a deadlock, until such moneys as have been loaned to the Company by PJM have been repaid, PJM shall have one additional vote in order to resolve the deadlock.   Once said loans have been fully repaid, if there is a deadlock, the parties will seek advice from its Certified Public Accountant or an attorney agreed upon by the Members (the "Professional") who will provide advice as to the issue being voted upon.  If the provided advice is not accepted by both Members, the Professional shall render a vote and his/her vote shall be final. Any action required may be taken without a meeting if, prior or subsequent to such action a unanimous consent of the Members is made in writing.   Notwithstanding the foregoing, the following shall require the unanimous consent of the Members:

(i)     Incur any expenditure or any liability of any nature in excess of $10,000.00
(ii)    Enter into any real property leases, licenses of intellectual property or other contracts over $10,000 in value;
(iii)   Enter into any partnership or joint venture with any person, firm or corporation;
(iv)   Admit new members, allot, issue, purchase, redeem or cancel any Membership Interests, or grant any options of similar rights in respect of Membership Interests
(v)    Encumber or mortgage any Company assets or properties;

7

(vi)    Dispose of any Company material assets other than in the ordinary course of business;

(vii)   Make distributions other than as provided under the Agreement;

(viii)  Obtain any financing or incur any borrowing

(ix)    Make any loans to any person, firm or entity;

(x)     Guarantee the obligations of any person;

(xi)    Merge or consolidate with another business entity;

(xii)   Commence legal proceedings before any court, or settle any such proceedings;

(xiii)  Change the Certified Public Accountant of the Company;

(xiv)   Enter into arrangements with third parties for the distribution and sale of the Company's products;

(xv)    Appoint any person, firm or corporation to sell products on behalf of the Company (other than the hiring licensed employees)

(xvi)   Authorize any change to employee salaries or benefits.

(b)     Unless otherwise agreed to by the Members unanimously in writing, no Member or Manager shall receive compensation for their services to the Company. This provision shall not act to restrict JY from receiving brokerage fees on any transaction involving the Company in which he acts as the Company's real estate agent. It is also acknowledged that PJM shall not personally guarantee any loans to the Company, nor shall he be asked to do so.

(c)     The Members shall appoint officers of the Company ("Officers"), including a President (the "President"). Initially, the President shall be JY. JY shall also act in the capacity of Chief Executive Officer. By majority vote, the Members may also appoint such other Officers as the Members in their discretion may determine or who may be appointed by the other Officers if specifically authorized to do so by the Members. The President shall, subject to the power and authority of the Members as set forth herein, have overall responsibility for the management of the normal and customary day-to-day operations of the Company and will be empowered to and will engage in all appropriate and necessary activities to accomplish the purposes of the Company. All other Managers shall also exercise their powers and perform such duties as may be properly delegated by the President. The Members shall appoint a Secretary who shall keep full minutes of all meetings of the Members; attend all meetings of the Members, and record all votes, consents and the minutes of all proceedings in a book to be kept for that purpose. He shall give or cause to be given, notices of all meetings of the Members of the Company and shall perform such other duties as may be prescribed the Members. The initial Secretary will be PJM.

The Members shall appoint a Treasurer, who shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company, and shall deposit all moneys and other valuable effects in the name and to the credit of the Company, in such depositories as may be designated by the Members. The Treasurer shall disburse the funds of the Company as may be ordered by the Members, taking proper vouchers for such disbursements, and shall render to the Members, at the regular meetings of the Members, or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Company. The Treasurer shall also specifically be empowered to make distributions to the Members as is

8

contemplated by the terms of the Operating Agreement and other directives which may be provided to him. The initial Treasurer shall be PJM. PJM also shall have the authority to appoint a Chief Financial Officer ("CFO"). The CFO shall be permitted to act in PJM's stead but shall not be authorized to make any decisions which require a monetary commitment of any type in excess of $10,000.00 unless previously approved by PJM in writing.

(d)     Each of the parties to this Agreement covenants with the others that it will at all times execute documents, consents and other instruments and act and cast, or cause or direct the casting of votes, and cause its nominee or nominees to so act and/or vote, to the extent permitted by law, as may be necessary or desirable to give full and proper effect to all the terms and provisions and the intentions of this Agreement and in particular, without limiting the generality of the foregoing, to enable any transfers of Membership Interests permitted or required under this Agreement to be made. Each of the parties to this Agreement agrees that violation on its part of this covenant entitles any of the Members to the remedy of specific performance and to an injunction from any court of competent jurisdiction to prevent any breach of this covenant or any other covenant contained in this Agreement and to restrain any further violation of the covenant.

(e)     The Company shall maintain bank accounts with such entity or entities determined by the Treasurer. All accounts will require the signature of the Treasurer or CFO for any disbursements from said account in excess of $10,000.00, with the CFO's authority limited as set forth in Section 6.01(c) hereof. If there are less than two persons remaining as Members at any time, this provision shall be deemed amended to permit sole signatory authority by the remaining Member.

6.02    Outside Activities – With the exception of transactions, investments and projects involving and concerning real estate matters, all Members and Managers shall be free to pursue any outside activities of any type. As to transactions, investments and projects involving and concerning real estate matters, a Member or Manager may pursue the same only after having first offered the opportunity for participation therein to the other Members, Managers and the Company, in writing, with participation consistent with the Membership Interests in the Company.

6.03    Indemnification of Members and Certain Other Persons
(a)     No Member is liable, in damages or otherwise, to the Company or any Member for any act or omission on its part pursuant to the authority granted by this Agreement, except if the act or omission results from such Member's own bad faith, fraud, gross negligence or willful misconduct. To the fullest extent permitted by law, the Company indemnifies and holds harmless each Member, (an "Indemnitee"), from and against any and all losses, claims, demands, costs, damages, liabilities (joint or several), expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements, and other amounts ("Damages") arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which an Indemnitee may be involved, or threatened to be involved, as a party or otherwise, arising out of or incidental to the Company's business, regardless of whether an Indemnitee continues to be a Member at the time any such liability or expense is paid or incurred, if (i) the Indemnitee acted in good faith and in a manner it reasonably believed to be in, or not opposed to, the Company's interests, and, with respect to any

9

criminal proceeding, had no reason to believe its conduct was unlawful; and (ii) the Indemnitee's conduct did not constitute bad faith, fraud, gross negligence, or willful or wanton misconduct. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere, or its equivalent, does not, in and of itself, create a presumption or otherwise constitute evidence that the Indemnitee acted in a manner contrary to that specified in (i) or (ii) above.

(b)        Notwithstanding anything contained in this Section 6.03, the Company does not indemnify and hold harmless an Indemnitee if a judgment or other final adjudication adverse to the Indemnitee establishes (i) that the Indemnitee's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action adjudicated or (ii) that the Indemnitee personally gained financial profit or other advantage to which such Member was not legally entitled.

(c)        Any indemnification under these provisions will be satisfied only out of Company assets, and the Members will not be subject to personal liability by reason of these indemnification provisions.

(d)        An Indemnitee will not be denied indemnification in whole or in part under this Section 6.03 because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

(e)        The provisions of this Section 6.03 are for the benefit of each Indemnitee and his successors, assigns, administrators and representatives and do not create any rights for the benefit of any other Persons.

6.04    Intentionally Omitted.

6.05    Intentionally Omitted.

6.06    Other Matters Concerning Members
(a)        Each Member may rely on and is protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document that it reasonably believed to be genuine and to have been signed or presented by the proper party or parties.

(b)        For purposes of this Agreement, each Member may consult with legal counsel, accountants, appraisers, management consultants, or investment bankers he selects. For so long as the information provided to the person is full and accurate such that the Person may provide fully informed advice and for so long as the Persons advice or opinion are on matters that the Member reasonably believes to be within the Person's professional or expert competence, any act or omission by the Member, if done or omitted to be done in reliance on any the advice or

10

opinion, is conclusively presumed to have been done or omitted to be done in good faith and not to constitute fraud, gross negligence or willful or wanton misconduct.

(c)      Each Member severally represents and warrants to each other Member and to the Company that it is acquiring its interest in the Company for its own account for investment and not with a view to the distribution of it or with any present intention of distributing the interest, in each case, in violation of applicable securities laws.

7.    Books, Records, Accounting and Other Information

7.01   Records and Accounting
The Company must keep appropriate books and records in accordance with the Act with respect to the Company's business. These books and records must at all times be kept at the principal office of the Company or other location as the Members determine.

7.02   Other Information
For any purpose reasonably related to its Membership Interest, each Member and its representatives have free access during normal business hours to discuss the Company operations and business with the Company's employees or agents, and to inspect, audit or make copies of all books, records and other information relative to Company operations and business at its own expense; provided, however, that each Member must preserve the confidentiality of such information.

8.    Tax Matters

8.01   Preparation of Tax Returns
The Company must arrange for the preparation and timely filing, and prior review by the independent accounting firm engaged by the Company from time to time, of all returns of Company income, gains, deductions, losses and other items necessary for federal, state, local and foreign income tax purposes and must use all reasonable efforts to furnish to the Members, within sixty (60) days after the close of the taxable year, the tax information reasonably required for federal, state, local and foreign income tax reporting purposes. The taxable year of the Company is the calendar year unless another year is required by the Code.

8.02   Tax Controversies
JY is designated as the "tax matters partner" (as defined in Code Section 6231). The "tax matters partner" must not, without the Members' prior consent, (i) extend the statute of limitations on any taxable period of the Company, (ii) file suit on the Company's behalf with respect to any tax matter; or (iii) enter into a settlement agreement on the Company's behalf with any taxing authority concerning any Company tax matter. The "tax matters partner" must inform each Member of all significant tax matters that come to its attention and must forward to each Member copies of all written communications from taxing authorities which it receives in its capacity as "tax matters partner." The "tax matters partner" will permit each Member to participate in any conferences or meetings with any taxing authority relating to any Company tax

11

audit and any subsequent administrative or judicial proceedings. Nothing in this Section 8.02 limits any Member's ability to take any action in its individual capacity with respect to tax audit matters to the extent permitted by Code Sections 6221 through 6233 or any similar state or local provision of law.

8.03   Withholding
Each Member authorizes the Company to withhold and pay over any taxes payable by the Company as a result of the Member's participation in the Company.

9.   Membership Interest Units

9.01   Membership Interests in the Company shall be represented by Membership Interest Units, and the Company shall be authorized to issue certificates representing such Membership Interest Units.

9.02   The Company shall be authorized to issue a maximum of 150,000 Membership Interest Units.

9.03   Membership Interest Units that are authorized but not yet issued may be issued or sold from time to time for the consideration determined by majority vote of the Members and certificates representing such Membership Interests may be issued.

10.   Transfers of Membership Interests

10.01   No Member may make a Transfer of his Membership Interest to any Person, unless the Transfer is approved in advance unanimously the Members.

10.02   Conditions of Transfer
In the event of a permitted purchase of the selling member's interest ("Selling Interest") in the Company by a third party purchaser, and as a condition to recognizing the effectiveness and binding nature of any such sale and substitution of a new Member as against the Company or otherwise, the Members may condition the transfer upon the proposed transferee's agreement to elect a certain persons to a specified office, and may require the Selling Member and/or the proposed transferee to execute, acknowledge and deliver to the Company and remaining Members, the instruments of transfer,  assignment and assumption and other certificates, representations and documents, and to perform all other  acts which the Members deem necessary or desirable to:

(a)   Constitute the purchaser, donee or successor-in-interest as a Member;

(b)   Confirm that the person desiring to acquire an interest or interests in the Company,  or to be admitted as a Member, has agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement;

12

(c)    Preserve the Company after the completion of the sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(d)    Maintain the status of the Company for federal tax purposes; and

(e)    Assure compliance with any applicable state and federal laws, including securities laws and regulations.

10.03    Compliance With This Agreement

To the fullest extent permitted by law, any Transfer or attempted Transfer of, including the creation or existence of a charging order, lien or encumbrance on, whether voluntary or involuntary, or by operation of law, any Membership Interest in violation of any of the provisions of this Article 10 is null and void, and the purported transferee is not entitled to (a) receive any distributions or profits in respect to it, (b) participate in any solicitation for, or otherwise participate in any vote, consent or approval with respect to any event set forth or referred to in this Agreement requiring the vote, consent or approval of any of the Members, or (c) become a substitute or additional Member of the Company.

10.04    Transfer of Certificates

Certificates representing Membership Interest if the same are issued by the Company, shall be transferable only on the books of the Company. Transfer shall be permitted only by the Person in whose name the such certificates appear on the Company's books, by that Person's legal representative, or by that Person's attorney if authorized by power of attorney duly executed and filed with the Company. Transfers of Certificates representing Membership Interest Units may be made on surrender to the Company or to its agents of an outstanding certificate or certificates along with a duly executed assignment and authorization to transfer endorsed on or attached to the certificate, together with proof of the authenticity of the signature and of the power of the assignor to transfer the security as the Company or its agents may require. On surrender, the Company or its agent shall issue a new certificate to the person entitled to it, cancel the old certificate, and record the transaction on its books. Except as provided in these by-laws or by the laws of the State of Delaware, the person in whose name Certificates representing Membership Interest Units stand on the books of the Company shall be deemed the owner for all purposes.

10.05    Lost, etc. Certificates

The Members may direct that a new Certificate representing Membership Interest Units be issued to replace any such certificate alleged to have been lost, destroyed, or wrongfully taken, on written notice received from the Member. The notice required from the Member shall be in the form of an affidavit showing that the certificate has been lost, destroyed, or wrongfully taken. When issuing a new certificate, the Members may, in its discretion and as a condition precedent to the certificate's issuance, require the Member or the Member's legal representative to indemnify the Company against any claim that may be made against the Company with respect to the certificate alleged to have been lost, destroyed, or wrongfully taken.

13

11.    Admission of Additional or Substitute Members

11.01    Admission of Additional or Substitute Members
The permitted transferee of a Transfer of a Member's Membership Interests, made and approved
as provided in Article 10, must be admitted to the Company as an additional or a substitute
Member.

12.    Withdrawal of Members

12.01    Withdrawal of Members
(a)    No Member has the right to voluntarily withdraw from the Company unless the Member
has transferred all of its Membership Interests in compliance with the applicable provisions of
Article 10.

(b)    A Person ceases to be a Member on the happening of any of the following events (a
"Withdrawal Event"):

 (i)    A Member becoming Bankrupt;
 (ii)    In the case of a Member who is a natural person, the death of the Member or the
Permanent Disability of the Member, or the entry of an order by a court of competent
jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;
 (iii)    In the case of a Member who is acting as a Member by virtue of being a trustee of a
trust, the termination of the trust (but not merely the substitution of a new trustee);
 (iv)    In the case of a Member that is a separate Entity other than a corporation, the
dissolution and commencement of winding up of the separate Entity;
 (v)    In the case of a Member that is a corporation, the filing of a certificate of
dissolution, or its equivalent, for the corporation or the revocation of its charter;
 (vi)    In the case of a Member which is an estate, the distribution by the fiduciary of the
estate's entire interest in the limited liability company; or
 (vii)    Upon the completion of transfer of all of its Membership Interests in compliance
with the applicable provisions of Article 10;
 (viii)    Upon the occurrence of any event causing dissociation of a Member specified by
law, unless otherwise provided in this Agreement; or
 (ix)    any Involuntary Transfer or attempted Transfer of any Membership Interest, other
than as provided in this Agreement.

12.02    Rights of Withdrawing Member
In the event any Member withdraws from the Company prior to the expiration of a stated term of
existence as set forth in the Certificate of Formation, or in Section 2.04 above:

(a)    If the Withdrawal Event causes a dissolution and winding up of the Company under
Article 13, the Member is entitled to participate in the winding up of the Company to the same
extent as any other Member, except that any distributions to which the member would have been

entitled will be reduced by the damages sustained by the Company as a result of the dissolution and winding up;

(b)    If the Withdrawal Event does not cause a dissolution and winding up of the Company under Article 13, the Member is entitled to and shall be paid an amount equal to the value of the Member's Membership Interest in the Company.  The Company may pay the value which shall be determined by the Company's C.P.A. based upon the present value of the Membership Interest taking into account the book value of the Company assets as well as its obligations and financial commitments (Purchase Price). The Purchase Price, shall be paid by delivery of a non-negotiable promissory note having a term not to exceed two years, bearing interest at the Applicable Federal Rate for such loans as in effect of the day closing, and payable in quarterly payments of principal and interest in arrears until the note is paid in full. The Membership Interest of the Withdrawing Member shall act as security until payment of the balance of the note is satisfied.

13.    Dissolution and Liquidation

13.01   Dissolution
The Company is dissolved and its affairs must be wound up on the first to occur of any of the following events:

(a)    The expiration of the Company's term as provided in Section 2.04 of this Agreement;

(b)    The death, disability or Bankruptcy of any Member; provided, however, that on any death or Bankruptcy, the remaining Members may vote unanimously to continue to carry on the Company business pursuant to, and subject to, all of the terms and provisions of this Agreement;

(c)    The sale of all or substantially all of the Company assets;

(d)    The Members' unanimous written consent.

(e)    As otherwise provided by the Act.

13.02   Liquidation

(a)    The proceeds of the Company's liquidation will be applied in the following order of priority, unless otherwise required by applicable law:

(i)    First, to the Company's creditors including creditors who are Members, in order of priority provided by law, in satisfaction of all the Company's liabilities and obligations (of any nature whatsoever, including, without limitation, fixed or contingent, matured or unmatured, legal or equitable, secured or unsecured), whether by payment or the making of reasonable provision for payment; and

15

(ii)    Thereafter, in accordance with the provisions of Section 5.01 of this Agreement.

14.    Amendment of Operating Agreement

14.01    Amendment Procedures

Amendments to this Agreement may be proposed by any Member. Any proposed amendment to this Agreement is effective only if adopted by all Members. Notwithstanding the foregoing, the conversion of the Company to another form of business entity through any mechanism shall not be considered an amendment of this Operating Agreement.

15.    Authorized Loan Transaction

By execution of this Operating Agreement, all parties hereto agree, consent to and authorize, and the Company is deemed to have entered into, a loan agreement which shall be further evidenced in a separate writing, which shall memorialize the loan by PJM to the Company in the amount of $1,500,000.00. Proceeds from said loan are to be used solely as capital for the operations of the Company and shall be repaid by the Company to PJM on or before the date 18 months after the date hereof. Interest shall accrue thereon at the rate of three (3) per cent per annum. The Members' Membership Interests in the Company and all of the Company's assets shall be pledged as security for said loan, and the Company shall provide to PJM a broad UCC-1 on all its assets.

16.    General Provisions

16.01    Notices

All notices, requests, demands and other communications required or permitted in this Agreement must be in writing, must refer to this Agreement and, unless otherwise expressly provided elsewhere in this Agreement, may be delivered personally or sent by certified mail, return receipt requested, or by overnight air courier guaranteeing delivery within two Business Days ("Courier"), or by telecopy or electronic communication , to the party at the address or telecopy number to which such party has consented to receive such notice (or to such other address or telecopy number as may be designated by notice given in accordance with this Section 15.01). The notice, request, demand or other communication is deemed delivered (i) at the time delivered by hand, if personally delivered; (ii) five Business Days after being deposited in the US mail, by certified mail, return receipt requested, postage prepaid, if mailed; (iii) the second Business Day after timely delivery to the Courier, if sent by Courier; and (iv) when delivery is confirmed to the sender, if sent by telecopy or electronic communication.

16.02    Specific Performance

The parties to this Agreement agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. The parties agree that they are entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions in any United

16

States court or any state having jurisdiction, in addition to any other remedy to which they are entitled at law or in equity.

16.03   No Third-Party Beneficiaries

The parties agree that this Agreement and the covenants made in it are made expressly and solely for the benefit of the parties (including any Person who agrees in writing to become a party to the Agreement as provided in Article 10), and that no other Person, other than an Indemnitee under Section 6.03 of this Agreement is entitled or deemed to be entitled to any benefits or rights under this Agreement, nor be authorized or entitled to enforce any rights, claims or remedies under or by reason of this Agreement.

16.04   Successors and Assigns

All of the terms and provisions of this Agreement inure to the benefit of and are binding on each of the parties to this Agreement and their respective permitted transferees, if any; provided that, except as expressly provided elsewhere in this Agreement, no party may or assign its Membership Interest (or any portion of or any beneficial interest in it) or this Agreement or its rights, interests or obligations under this Agreement except in accordance with the terms of this Agreement.

16.05   Entire Agreement

This Agreement (including the schedules and exhibits) contains the entire agreement among the parties with respect to the subject matter and supersedes all prior agreements, proposals, representations, arrangements or understandings, written or oral, with respect to the subject matter. Without limiting the generality of the foregoing, all prior operating agreements between Furey and the Company are hereby revoked.

16.06   Severability

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction, in such jurisdiction, is ineffective to the extent of the prohibition or unenforceability, and any prohibition or unenforceability in any jurisdiction does not invalidate or render unenforceable the provision in any other jurisdiction. If any provision of this Agreement is held or deemed to be or is inoperative or unenforceable as applied in any particular case because it conflicts with any other provision or provisions of this Agreement or any law, statute, ordinance, rule, regulation, order, writ, decree or injunction, or for any other reason, the circumstances will not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provisions in this Agreement invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement does not affect the remaining portions.

16.07   Attorneys' Fees

In any action or proceeding brought to enforce any provision of this Agreement, or where any provision is validly asserted as a defense, the successful party is entitled to recover reasonable attorneys' fees in addition to any other available remedy.

17

16.08   Headings
All section headings in this Agreement are for convenience of reference only and are not part of
this Agreement, and no construction or inference may be derived from them.

16.09   Gender and Number
Whenever required by the context, the singular includes the plural, and the plural includes the
singular. The terms "his", "her", "he", "she" and "it" shall be interchangeable and deemed to
have the same meaning.

16.10   Applicable Law
This Agreement is governed by and construed in accordance with the laws of Delaware,
applicable to agreements made and to be performed entirely within the state, without regard to
principles of conflict of laws.

16.11   Representation
The Members acknowledge that The Law Offices of Bruce E. Baldinger, LLC ("BEB") has
represented certain Members in various other transactions. Accordingly, the Members each have
had this Operating Agreement reviewed by independent counsel or have knowingly waived his
right to do so. In doing so, the Members recognize that BEB is herein representing the Company
with the participation of the Members and therefore have not relied upon any statements,
representations or legal advice of BEB or any of its attorneys.

16.12   Counterparts
This Agreement may be executed in one or more counterparts, each of which is deemed to be an
original, but all of which together constitute one and the same instrument.

        IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date
first above written.


**BAYLOR HOLDING, LLC**


By:    _____
        JEFFREY YOHAI
        President and Chief Executive Officer



**MEMBERS**




                                    18

JEFFREY YOHAI

PAUL J. MANAFORT

Schedule I

## MEMBERS

1.  Jeffrey Yohai, 75,000 units – 50%

2.  Paul J. Manafort, 75,000 units – 50%

Schedule II

CAPITAL CONTRIBUTIONS AND LOANS

| Member | Capital Contribution & Loans |
| --- | --- |
| Jeffrey Yohai | $2,100,000.00 |
| Paul J. Manafort | $2,250,000.00 |

21

Schedule III

## INITIAL PROJECTS

779 Stradella LLC
2727 Cardwell LLC
Marin West LLC
2501 Nottingham
Mt Yohai – Nottingham
Blue Jay
Cockerham
391 Broadway
Spring St
Stanley

22

# EXHIBIT "2"

# EXHIBIT "2"

1

## OPERATING AGREEMENT OF 779 STRADELLA, LLC

This Operating Agreement ("Agreement") of 779 Stradella, LLC (herein "Stradella"), a Delaware Limited Liability Company, is effective as of the 18th day of February 2016 ("Effective Date") between the Members.

### WITNESSETH

The Members wish to establish this Operating Agreement for the governance of the Company.

NOW THEREFORE in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, all of the Members of the Company hereby acknowledge and agree to the following:

### SECTION I
### FORMATION AND PURPOSE

The Company was formed pursuant to the Delaware Limited Liability Company Act, as may be amended from time to time (the "Act").

Each Member confirms and agrees to its status as Member, its Membership Class, and subscribes to the acquisition of a Membership Interest upon the terms and conditions set forth in this Agreement.

Each Member hereby executes and adopts this Agreement as the Operating Agreement of the Company, pursuant to the Act. The Members and the Company hereby agree that the duties and obligations imposed on the Members of the Company shall be those set forth in this Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

1. <u>Name</u>.
The name of the Company is 779 Stradella, LLC. All Company business must be conducted in the name of the Company. Title to all assets of the Company shall be held in the name of the Company.

2. <u>Principal Office</u>.
The principal office of the Company shall be 10 St. James Drive, Palm Beach Gardens, FL 33418.

2

### 3. Governing Law.

This Agreement and all issues regarding the rights and obligations of the Members, the construction, enforcement and interpretation hereof, and the formation, administration and termination of the Company shall be governed by the provisions of the Act and other applicable laws of the State of Delaware, without reference to conflict of laws principles.

### 4. Purposes.

The Company has been formed for the purpose of transacting any and all lawful business for which limited liability companies may be organized under the Act.

### 5. Registered Agent and Office.

The registered agent for the service of process and the registered office shall be that person and that office location reflected in the Articles of Organization as filed with the Delaware Secretary of State. The Managing Member(s), may, from time to time, change the registered agent or office through appropriate state filings. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Member(s) shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

### SECTION II
### STATUS, CLASSES, RIGHTS AND OBLIGATIONS OF MEMBERS

### 1. Members.

There shall be one class of members: At the time of the execution of this Agreement, the following are the Class A Members of the Company:

Baylor Holding, LLC

The term "Member" as used herein, when it is not used with a specific Class designation, refers to a Class A Member.

### 2. Notice of Address and Membership Interest.

The notice of the address of the Members are set forth on Attachment A. The Members each agree that each Member's percentage of ownership interest ("Membership Interest") as well as the Class of the Membership Interest, shall be set forth on Exhibit A as may be amended from time to time pursuant to this Agreement.

### 3. Voting.

3

Only Class A Members are entitled to vote on any matters. Class A Members shall vote in proportion to their respective Membership Interests. Unless otherwise provided herein, for the purposes of this Agreement, any action requiring a vote, consent, or approval of a majority of the outstanding Class A Membership Interests shall be authorized if Class A Members holding more than fifty percent of the outstanding Class A Membership Interests, vote for, consent to or approve, such action.

4.  Action Without a Meeting.
Any action required or permitted to be taken at a meeting of the Class A Members may be taken without a meeting if the action is taken by Class A Members holding all of the outstanding Class A Membership Interests entitled to vote. Such an action without meeting shall be evidenced by a written consent signed by all Class A Members as required and filed with the Company's records.

5.  Conflicts of Interest.
A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to applicable law. No transaction with the Company shall be voidable solely because a Member has either a direct or indirect interest in the transaction if either the transaction is fair to the Company, or if, knowing the material facts of the transaction, the majority of the Class A Members authorize, approve or ratify the transaction.

6.  Other Activities.
Except as otherwise provided herein, any Member may engage in or possess any interest in other businesses of any nature and description, independently or with others and neither the Company nor any Member shall have any rights in or to any such independent venture or the income or profits derived therefrom, provided, however, that no Member shall engage in any independent venture or opportunity which competes with the business of the Company unless he has first presented such opportunity to the Company and a majority of the Class A Members have voted to decline such business opportunity on behalf of the Company.

7.  Right to Transfer Membership Interest.
No Class A Member shall have the right to transfer, hypothecate, mortgage, sell, exchange, assign or otherwise dispose of or grant an interest in (collectively "transfer") all or part of his Membership Interest to a third party or parties, including the Member's interest in any part of the Company's assets, receivables, records, documents records, files or clientele, all such rights and interests of such Member being personal to him and not transferable and

4

not assignable. Nothing herein shall prevent a Class A from selling back to the Company all or a portion of its Membership Interest under the terms of an option contained in a written Agreement with the Company.

Notwithstanding the foregoing, each Member agrees not to transfer all or any part of a Membership Interest (or take or omit any action, filing election or other action which could result in a deemed transfer) if such transfer (either considered alone or in the aggregate with prior transfers by other Members) would result in the termination of the Company for Federal Income tax purposes. Such transfer is void ab initio.

8. Liability of Members.
No Member shall be liable as such for the liabilities of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on any of the Members.

9. Indemnification.
The Company shall indemnify the Members for all costs, losses, liabilities and damages paid or accrued by such Member in connection with the business of the Company for acts or omissions which do not violate the standard of care set forth immediately below.

10. Members' Standard of Care.
Each Member's duty of care in the discharge of the Member=s duties to the Company and the other Members, including the duty of the Managing Member(s), is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. Members shall be fully protected in relying in good faith upon the records of the Company and upon such opinions reports or statements made by other Members or other person as to matters the Member reasonably believes to be in that person=s professional or expert competence.

11. Miscellaneous Member Obligations.
It shall be the duty of each Member to act at all times consistently with and in compliance with all and each of the provisions of this Agreement and with all policies, rules, and decisions of the Company adopted in accordance with the provisions of this Agreement.

## SECTION III
## MANAGEMENT BY MANAGING MEMBER

1. Managing Member(s).

5

There shall be one Managing Member (also referred to herein as "Manager"). Only a Class A Member may be a Managing Member. All decisions concerning the business affairs of the Company shall be made by the Managing Member.

The initial Managing Member, any one of whom has the authority individually and without the signature of the other Managing Member, to bind the company, shall be:

　　　Baylor Holding, LLC

Any vacancy in the office of the Manager shall be filled by vote of the Majority of Class A Members.

2. <u>Term of Managing Member(s)</u>.
Each Managing Member shall serve until the earliest of:

(a) The Withdrawal of such Managing Member;
(b) The Resignation of such Managing Member;
(c) Removal of the Managing Member as provided for by this Agreement; or
(d) The election and qualification of the Managing Member's successor by a Majority of the Class A Members.

3. <u>Authority of Members to Bind the Company</u>.
Only the Managing Member and agents of the Company authorized by the Managing Member shall have the authority to bind the Company. No Member who is not either a Managing Member or otherwise specifically authorized by a Managing Member in writing to act as an agent shall take any action to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Each Managing Member has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company.

4. <u>Agents of the Company</u>
Unless stated otherwise herein, the Managing Member designates and authorizes Richard W. Gates as an authorized agent to act in all respects on behalf of the Company.

5. <u>Third Party Reliance</u>.
Notwithstanding the failure of the Managing Members to reach a consensus on any management matter, no person dealing with the Company shall have any obligation to inquire into the power or authority of any Managing Member acting on behalf of the Company when that act is for the purpose of apparently carrying on the usual business or affairs of the Company, including the exercise of the authority indicated herein.

6

6. Removal of Managing Member.

A Managing Member may be removed by the affirmative vote of a Majority of the Class A Members, for cause only. "For cause" means willful misconduct or fraud.

## SECTION IV
## CAPITAL CONTRIBUTIONS AND FINANCIAL OBLIGATIONS OF MEMBERS

1. Initial Capital Contributions.

The capital contributions of the Members are as set forth on Attachment A. Such capital may be used for any lawful purpose.

2. Additional Contributions.

The Managing Member may arrange for the provision of such additional funds as are deemed necessary to conduct the Company's business. Such additional funds may be raised by loan to the Company from an outside source or by a loan or capital contribution to the Company by one or more Members.

3. No Interest On Contributions.

No Member shall be entitled to interest on his capital contribution.

4. Return of Capital Contributions.

No Member shall be entitled to withdraw any part of his capital contribution or capital account or to receive any distribution from the Company, except as specifically provided for in this Agreement. Except as otherwise provided herein there shall be no obligation to return to any Member or withdrawn Member any part of such Member's Capital contributions to the Company for so long as the Company remains in existence. If the Company is continued by unanimous consent of the remaining Members following the death, disability or withdrawal of a Member, the former Member shall continue to receive the share of the distributions and return of capital at such time and in such manner as such party would have received the distributions had such former party remained a member of the Company.

5. Loans Not to be Treated as Capital Contributions.

Loans or advances by any Member to the Company shall not be considered capital contributions and shall not increase the capital account balance of the lending or advancing Member.

6. Limited Liability.

7

Except as otherwise provided in this Agreement, no Member shall be required under any circumstances to contribute or lend money or property to the Company.

7. Guaranty of Company Indebtedness.
A Member shall not be obligated to guarantee the Company indebtedness or other contractual obligations unless he agrees to do so.

8. No Third Party Beneficiaries.
The provisions of this Agreement relating to the financial obligations of Members are not intended for the benefit of any creditor or other person to whom any debts, liabilities or obligations are owed by or who otherwise have any claim against the Company or any of the Members, and, except for Members, no creditor or other person shall obtain any right under any such provisions or shall by reason of any such provisions make any claim with respect to any debt, liability or obligation (or otherwise) against the Company or any of its Members.

## SECTION V
## DISTRIBUTION OF CASH AND PROPERTY

1. Distribution of Net Cash Flow.
The term "net cash flow" for a fiscal year shall mean:
All cash receipts as shown on the books of the Company (excluding, however, capital contributions from members, net proceeds to the Company from the sale or the disposition of substantially all of the assets, condemnation process, and excess title, property, casualty, or liability insurance proceeds, if any, for the restoration or repair of the Company assets), reduced by cash disbursements for Company purposes including interest and principal upon loans, and cash reserves set aside by the Managing Members which the Managing Members deem necessary in their discretion to accomplish the Company's business purpose, plus any other funds, including the amounts previously set aside as reserves for distribution as net cash flow.

2. Priority of Distribution.
The net cash flow of the Company for a fiscal year shall be paid out to the Members pro rata in accordance with their respective Membership Interests at such time as the Managing Member(s) determines.

3. Distribution of the Proceeds of Dissolution.
If the Company dissolves, the net proceeds of dissolution, including any accompanying sale of Company assets, shall be distributed in the following order of priority:

8

First, toward the satisfaction of all outstanding debts and other obligations of the Company, including Members, who are creditors, then pro rata among those members with a positive capital account balance, after adjustments for the above distributions, and tax allocations for the current fiscal year, in proportion to their respective capital accounts.

## SECTION VI
## FEDERAL AND STATE TAX MATTERS

1. Maintenance of Members' Capital Accounts.
With respect to each Member a separate "Capital Account" for such Member shall be established and maintained throughout the full term of the Company in accordance with applicable Treasury Regulations that must be complied with in order for the allocations of taxable profits and losses provided in this Agreement to have Aeconomic effect@ under applicable Treasury Regulations.

2. Allocations of Profits and Losses of the Company.
The Company=s net income or loss for a fiscal year computed in accordance with applicable federal income tax accounting principles shall be allocated among the Members in accordance with their respective Membership Interests.

3. Special Tax Allocation.
Notwithstanding anything to the contrary contained in this Agreement, the Company shall comply with IRS Section 704 and Treasury Regulation section 1.704 with respect to all applicable tax allocations.

4. Tax Year and Accounting Matters.
The taxable year of the Company shall be the calendar year. The Company shall adopt such methods of accounting and file its tax returns using the methods of accounting determined upon the advice of the accountant servicing the books and records of the Company.

5. Tax Elections.
The Company may make or revoke all tax elections provided for under the Internal Revenue Code upon a decision by the Manager(s) on the advice of the accountant servicing the books and records of the Company.

## SECTION VII

9

## TERM AND TERMINATION OF THE COMPANY

1. Term of the Company.

The term of the Company commenced upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall continue in perpetuity, unless sooner dissolved and terminated as provided in this Agreement.

2. Events of Termination.

The Company shall be dissolved upon the occurrence of any of the following events:

(a) The determination in writing of the Managing Members to dissolve and terminate the Company;

(b) The sale, transfer or assignment of all or substantially all of the assets of the Company;

(c) The adjudication of the Company as insolvent or the filing of an involuntary petition in bankruptcy, or reorganization, against the Company which is not dismissed within 90 days, or the appointment for the company of a temporary or permanent receiver, trustee, custodian and such receiver, trustee or custodian is not dismissed within 90 days;

(d) Entry of a decree of dissolution;

(e) The death, retirement, dissolution, termination, resignation, insanity, insolvency of a Member, unless within 6 months of such event the Class A Members by a majority agree to continue the company and, if the death is that of a Managing Member, select a new Managing Member, in which event the Company shall not be dissolved and the Company business shall be continued.

(f) When so determined in accordance with other specific provisions of this Agreement;

(g) As otherwise required by applicable law.

3. Conclusion of Affairs.

In the event of a dissolution of the Company for any reason, the Members shall proceed promptly to wind up the affairs and liquidate the Company. Except as otherwise provided in the Agreement, the Members shall continue to share in the distributions and the tax allocations during the period of liquidation in the same manner as before the dissolution. After paying or providing for the payment of all debts and liabilities of the Company and all expenses of liquidation, the proceeds of liquidation shall be distributed to or for the benefit of Members in accordance with this Agreement.

4. Liquidating Distributions.

After paying for or providing for the payment of all debts or liabilities of the Company and all the expenses of liquidation, and subject to the setting up of reserves the majority of Class A Members deem necessary for any contingent or unforeseen liabilities or obligations

10

of the Company, the proceeds of the liquidation and any other assets of the Company shall be distributed of the benefit of the Members in accordance with this Agreement.

5. Termination.
Within a reasonable time following the completion of the liquidation of the Company, the Company shall terminate and any Member shall have the authority to execute and file with any appropriate state authority a Certificate of Cancellation of the Company or any similar documentation required by such authority.

# SECTION VIII
## ADMISSION AND WITHDRAWAL OF MEMBERS

1. Admission.
No Member shall be added without unanimous written consent of the Managing Members.

2. Expulsion.
Any Member may be expelled from the Company by action of the Class A Members holding a majority of the outstanding Membership Interests entitled to be voted, upon a default of such Member of any of his obligations hereunder, if such default continues for a period of 30 days after notice thereof is given to him by the Company.

3. Withdrawal.
No Member shall have the right to voluntarily resign or otherwise withdraw from the Company without the unanimous written consent of the Managing Member. Notwithstanding the consent to withdraw, no member shall be entitled to receive any compensation or distribution with respect to the withdrawal, except as otherwise provided herein.

4. Effect of Withdrawal or Expulsion.
On and as of the effective date of withdrawal or expulsion from the Company under the provisions of this Agreement, such former Member shall cease to have any Membership Interest, or other rights, status or privileges of a Member, but such former Member shall not be released or discharged from any of the obligations of a Member under the provisions of this Agreement, unless provided in the written consent of Members holding all of the outstanding Class A Membership Interests entitled to be voted.

5. Purchase of Membership Interests Upon Expulsion, Withdrawal or Death of Member.
Upon the Expulsion, Withdrawal or Death of a Member, that Member=s Membership Interest shall be purchased by the Company for a purchase price equal to the Fair Market

43

11

Value of the Member=s Interest. The Fair Market Value shall be determined by agreement between the Member (or his Personal Representative) and the Company, which agreement is subject to unanimous approval of the remaining Class A Members of the Company. If an agreement with respect to Fair Market Value cannot be reached within 60 days of the death, withdrawal or expulsion, the Fair Market Value shall be determined by appraisal. The Class A Members and the Member (or his personal representative) shall choose an appraiser and the two appraisers shall choose a third appraiser. The decision of the Majority of the appraisers as to the fair market value of the Membership Interests shall be final and binding. Each party shall pay for its/his appraiser and the third appraiser fee shall be shared by the both parties.

## SECTION IX
## ADMINISTRATIVE PROVISIONS

1. Books, Records, Accounts.
The Manager(s) shall cause faithful books and records to be kept using standard accounting procedures when applicable. The books and records shall be kept in the Company's principal office. Only the Manager(s) shall be signatory on the bank accounts of the Company.

2. Notice.
Unless otherwise provided herein, any offer, acceptance, election, approval consent, certification, request, waiver, notice or other communication required or permitted to be given hereunder (collectively Anotice") shall be given by enclosing same in an envelope addressed to the Member to whom the Notice is to be given and deposited in the US Mail postage prepaid to the Member at such address listed in Attachment A, or at such other address as requested by the Member.

## SECTION X
## ARBITRATION

Any matter that arises involving the performance or interpretation of this Operating Agreement that the Members are unable to settle by mutual agreement, or arises as the result of an unsuccessful mediation as required in the case of a management dispute between the Managing Members, shall be settled by a panel of three Arbitrators. One Arbitrator shall be appointed by each managing Member and the third Arbitrator shall be appointed by the two appointed Arbitrators. The arbitration proceeding shall be conducted in accordance with the prevailing Commercial Arbitration Rules and Regulations of the American Arbitration Association. The decision of a majority of said Arbitrators shall be final and binding on all parties to this Agreement. The decision so rendered may be

12

entered in any court having jurisdiction. The Arbitrators shall not have authority to award punitive or other non-compensatory damages to any party. Each party shall bear its own costs and expenses of the arbitration; the costs and expenses of the arbitrators and the administrative costs of the arbitration will be equally shared by the parties.

## SECTION IX
## MISCELLANEOUS PROVISIONS

1. Amendment.

This Agreement, including any Attachments attached hereto, represent the entire Agreement of the Members with respect to the matters covered herein. Except as provided by law or otherwise provided herein, this Agreement shall only be amended by unanimous written consent of the Class A Members.

2. Interpretation.

Whenever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural, and vice versa.

3. Severability.

Each provision of this Agreement shall be considered severable. If for any reason any provision or provisions hereof are determined to be invalid or contrary to existing or future law, such invalidity shall not impair the operation or affect those portions of this Agreement which are valid, and the Agreement shall remain in full force and effect and shall be construed and enforced in all respects as if such invalid or unenforceable provision or provisions had been eliminated.

4. Further Assurances.

Each Member hereby agrees that he shall hereafter execute and deliver such further instruments, provide all information, and take or forebear from taking such further actions and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date above written.

MEMBERS:

Class A Members:

BY: _____     13

Baylor Holding, LLC

## ATTACHMENT A

| Member Name/ Class/Contribution Address | Membership Interest | Initial Capital Contribution (Cash) | Initial Capital (In Kind) |
|---|---|---|---|
| Class A Member(s): | | | |
| Baylor Holding, LLC | 100% | | |
| TOTALS | 100% | | |